## DEL WEBB CONSERVATION HOLDING CORP., an Arizona corporation, Plaintiff,

v.

Ronald L. TOLMAN, Jason D. Tolman, C. Brandon Prychodnik, Brent S. Tolman, U.S. Resources Management, an association, U.S. Resources Management Trust, Berge Dadourian, The Berge J. Dadourian Charitable Remainder Trust, Lucia Dadourian, Lu-

cia Dadourian Charitable Remainder Trust, Martin Schaffer, The Martin D. Schaffer Charitable Remainder Trust, Sharon Schaffer, The Sharon Schaffer Charitable Remainder Trust, Foad Moazez, Mojgan Moazez, Charles Rocchio, Robbie Kell, William R. Butler, Bonnie G. Cantor, Jason S. Smith, Jessica D. Miller, Eileen D. Zillman, Debbie White, Jeffrey Earl Fegert, an individual, Black Mountain Mining, Inc., a Nevada Corporation, Heavy Duty, LLC, a Nevada Limited Liability Corporation, Tim Edwards, an individual, North American Exploration, Inc., a Maine Corporation, Orson Tingey, Tri–Star Holdings, Ltd., Dennis Pyper, an individual, and John Does 1–15 and Does 1–15, Defendants.

Berge Dadourian, The Berge J. Dadourian Charitable Remainder Trust, Lucia Dadourian, Lucia Dadourian Charitable Remainder Trust, Martin Schaffer, The Martin D. Schaffer Charitable Remainder Trust, Sharon Schaffer, The Sharon Schaffer Charitable Remainder Trust, Foad Moazez, Mojgan Moazez, William R. Butler and Debbie White, Counter Plaintiffs and Third Party Plaintiffs,

v.

Del Webb Conservation Corporation, Bruce Babbit, in his official capacity as Secretary to the United States Department of the Interior, Matt Millenbach, in his official capacity as Deputy Director of the United States Department of the Interior, Michael F. Dwyer, in his official capacity as District Manager, Bureau of Land Management, Las Vegas, Counter Defendant and Third Party Defendants, jointly and severally.

No. CV–S–98–638–PMP(LRL).

United States District Court, D. Nevada.

April 7, 1999.

Steve Morris, Robert Grasso, Schreck Morris, Las Vegas, NV, Kenneth D. Hubbard, Peter M. Hamilton, Dorsey & Whitney LLP, Denver, CO, for Del Webb Conservation Holding Corp.

Daniel T. Foley, Foley & Jones, Las Vegas, NV, for Jeffrey Earl Fegert, Charles Rocchio, Brent S. Tolman, Jason D. Tolman, Larry R. Tolman, Robbie Kell, Troy Kell, Heavy Duty, LLC, Tim Edwards and Black Mountain Mining, Inc.

Thomas Hugh Peterson III, Las Vegas, NV, for Berge Dadourian, The Berge J. Dadourian Charitable Remainder Trust, Lucia Dadourian, Lucia Dadourian Charitable Remainder Trust, Martin Schaffer, The Martin D. Schaffer Charitable Remainder Trust, Sharon Schaffer, The Sharon Schaffer Charitable Remainder Trust, Foad Moazez, Mojgan Moazez, William R. Butler, North American Exploration, Inc., Orson Tingey, Tri–Star Holdings, Ltd., Dennis Pyper, Debbie White.

Stephen M. MacFarlane, Trial Attorney, Environment & Natural Resources Division, U.S. Department of Justice, Sacramento, CA, Elizabeth Russell, Trial Attorney, Civil Division, U.S. Department of Justice, Washington, DC, for federal third-party defendants.

### ORDER

PRO, District Judge.

Presently before the Court is Plaintiff and Counter–Defendant Del Webb Conservation Holding Corporation's ("Del Webb") Motion for Summary Judgment (Doc. # 128), filed on September 25, 1998. Defendants and Counter–Plaintiffs Berge Dadourian, The Berge Dadourian Charitable Remainder Trust, Lucia Dadourian, Lucia Dadourian Charitable Remainder Trust, Martin Schaffer, The Martin D. Schaffer Charitable Remainder Trust, Sharon Schaffer, The Sharon Schaffer Charitable Remainder Trust, Foad Moazez and Mojgan Moazez (the "Dadourian claimants") and Defendants and Counter–Plaintiffs William R. Butler, Bonnie G. Cantor, Jason S. Smith, Jessica D. Miller, Eileen D. Zillman and Debbie White (the "UOIL claimants") filed a Response (Doc. # 151) on February 4, 1999. A Supplement to its Response (Doc. # 157) was filed by the UOIL and Dadourian claimants on February 12, 1999. Del Webb filed a Reply (Doc. # 158) on February 22, 1999. The UOIL and Dadourian claimants filed a second Supplement to its Response (Doc. # 162) on March 8, 1999. Del Webb, in turn, filed a Supplemental Reply (Doc. # 166) on March 22, 1999.

## I. INTRODUCTION

This is a lawsuit concerning the validity of mining claims located on public lands patented to Del Webb by the federal Bureau of Land Management. Among the claimants to these mining claims are two groups of Defendants, referred to as the "Dadourian claimants" and the "UOIL claimants." Del Webb now seeks summary judgment quieting title in its favor as against the Dadourian and UOIL claimants only. In the process, Del Webb seeks the dismissal of the Dadourian and UOIL claimants' legal and equitable claims, due to lack of standing.

To dispose of Del Webb's motion, the Court must consider the two following questions: (1) Did the Dadourian claimants acquire any property rights in their mining claims from the alleged conveyance of quitclaim deeds? (2) Did the UOIL claimants acquire any property rights to their mining claims through the practice of "geologic inference," notwithstanding their failure to make an actual discovery of valuable minerals within the bounds of said claims?

## II. FACTUAL BACKGROUND

The provisions of the Federal Land Policy and Management Act of 1976 ("FLPMA"), Pub.L. No. 94–579, 90 Stat. 2743 (codified as amended at 43 U.S.C. §§ 1701–1784), charges the Bureau of Land Management (the "BLM") with the

protection of environmental, ecological and recreational values on public lands, while simultaneously providing for the sustained harvesting of natural resources. In the course of these activities and pursuant to statutory guidelines, the Secretary of the Department of the Interior (the "DOI") may exchange public lands for private lands if the Secretary "determines that the public interest will be well served by making that exchange." 43 U.S.C. § 1716(a). Public lands under consideration for exchange may be temporarily "segregated" from appropriation under federal mining laws. See 43 U.S.C. § 1716(i)(1). BLM regulations implementing these provisions are contained in 43 C.F.R. §§ 2200.0–2202.1.

On September 29, 1994, Del Webb submitted to the BLM a land exchange proposal, pursuant to 43 C.F.R. § 2201(1)(a). In this exchange proposal, Del Webb proposed to acquire 4,975 acres of public land (the "exchange lands") contiguous to the City of Henderson, Nevada, which is located in the southern portion of the Las Vegas Valley. Once it acquired the exchange lands from the federal government, Del Webb planned to develop the property into the Del Webb Anthem Master Planned Community, featuring a mixture of residential, recreational and commercial uses. In return, Del Webb proposed to convey to the United States environmentally fragile lands of comparable value elsewhere in Nevada. On October 19, 1995, the BLM formally "segregated" the public lands from further entry or disposal by others, in preparation for the land exchange.

Already within the bounds of the exchange lands, however, were three groups of placer mining claims. The first group of mining claims, known as the "Meldrum claims," was located sometime in 1989. Soon after locating their claims, the Meldrum claimants applied to the BLM for a plan of operations to mine sand and gravel. The BLM prepared a mineral report for the Meldrum claimants, which determined that the Meldrum claims did not contain a discovery of a "valuable mineral," because the sand and gravel within claim boundaries were of a common variety. A valuable mineral discovery is required for the creation of a private property interest in minerals located on public lands. See 30 U.S.C. § 22.

In 1991, as a result of the mineral report, the BLM initiated an administrative action called a "contest proceeding," seeking to nullify and void the Meldrum claims. See 43 C.F.R. § 4.451. During these proceedings, the Meldrum claimants' expert, Ken Brook, compiled a report of geological findings entitled "Exploration History and Economic Potential of the Meldrum Claims, Clark County, Nevada" (the "Brook Report"). The Brook Report asserted that the mining claims contained sufficient amounts of gold to justify economic attempts at recovery. Nevertheless, the parties reached a settlement agreement in 1993, by which the Meldrum claimants' reduced the total acreage of their claims from 1,280 to 420 acres. Two of the Meldrum mining claims were later voided, while the remainder was purchased by Del Webb in 1996.

The second group of mining claims extant on the selected lands was the "Black Mountain claims," which were located in 1993. These Black Mountain claims were positioned adjacent to the Meldrum claims.

On October 18, 1994, less than one month after Del Webb's submission of the proposed land exchange but before segregation, a group of individuals located a third group of mining claims which lay, in part, on the exchange lands near the Meldrum claims. These claims were labeled the "UOIL claims."

On April 17, 1998, Del Webb filed a Complaint (Doc. # 1) against the various claimants allegedly possessing mining interests on the exchange lands. Both the UOIL and Dadourian claimants were named as defendants. The Complaint

stated, *inter alia*, an action to quiet title pursuant to Nev.Rev.Stat. § 40.010.

On August 31, 1998, the UOIL and Dadourian defendants countersued by filing a First Amended Complaint (Doc. # 120), seeking to challenge the land exchange and vindicate perceived injuries to their alleged mining claim rights. The first cause of action accuses Del Webb of unlawful "conspiratorial cooperation" with the federal government to divest the UOIL and Dadourian claimants of their mining claims. (*See* First Amended Complaint, Doc. # 120, at 15–16.) As relief, the claimants seek monetary damages and the nullification of the land exchange.

## III. SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *See Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1050 (9th Cir.1995). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *See S.E.C. v. Seaboard Corp.,* 677 F.2d 1297, 1298 (9th Cir.1982).

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1305–06 (9th Cir.1982). The substantive law defines which facts are material. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact is more than some

"metaphysical doubt" as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over outcome determinative facts under the applicable substantive law will preclude the entry of summary judgment. *Id.* If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Metro Indus., Inc. v. Sammi Corp.,* 82 F.3d 839, 847 (9th Cir.), *cert. denied,* 519 U.S. 868, 117 S.Ct. 181, 136 L.Ed.2d 120 (1996). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *See Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505. In meeting this burden, parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *Keenan v. Allan,* 91 F.3d 1275, 1278 (9th Cir.1996).

The Supreme Court cases cited above establish that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed. R.Civ.P. 1).

## IV. DISCUSSION

In Nevada, an action to quiet title to real property is permitted pursuant to

Nev.Rev.Stat. § 40.010.[1] Such an action requests a judicial determination of all adverse claims to disputed property. *Clay v. Scheeline Banking & Trust Co.*, 40 Nev. 9, 159 P. 1081, 1082–83 (1916). In the case at bar, Del Webb asks this Court to quiet title to the exchange lands in its favor, on the grounds that the Dadourian and UOIL claimants cannot demonstrate any property interests in the mining claims and, consequently, any rights to the exchange lands in which they lie.

### A. The UOIL Claimants: Procedures for the Establishment of Mining Claims on Public Land under the Mining Law of 1872

Under the Mining Law of 1872, a claimant gains the indefinite and exclusive right to possession and enjoyment of minerals on public land if, *inter alia,* he: (1) locates a mining claim on public land open to location and (2) discovers a valuable mineral deposit. *See* 30 U.S.C. § 22; *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Independence Mining Co. v. Babbitt*, 105 F.3d 502, 506 (9th Cir.1997). In cases such as this one, involving the segregation of public lands in preparation for a land exchange, the mineral discovery must be made in a mining claim *prior* to the date of segregation in order to create a valid, cognizable property interest. *See C.V. Hallenbeck*, 21 IBLA 296, 301–02 (1975).

Here, Del Webb correctly points out that the UOIL claimants have failed to proffer any evidence of the required discovery of valuable minerals. Indeed, in two instances, the UOIL claimants have admitted to not even having performed the most basic exploratory work, such as the taking of core samples, within the UOIL claim boundaries. (*See* William R. Butler Dep., pp. 202–04, attached as Ex. 7 to Pl.'s Mot. for Summ.J., Doc. # 128; Ex. 8 of Pl.'s Mot. For Summ. J.) Such failure to make a valuable mineral discovery, before the BLM's segregation of the exchange lands in preparation for conveyance, will nullify the UOIL mining claims and extinguish the claimants' rights to the exchange lands. *See Best,* 371 U.S. at 336, 83 S.Ct. 379; *Essex Int'l, Inc.,* 15 IBLA 232, 246 (1974).

The UOIL claimants' arguments in opposition are inapposite to the Mining Law's requirements for the perfection of mining claims. First, the UOIL claimants vainly argue that the results of the Brook Report, which concluded that a gold deposit existed on the neighboring Meldrum claims, should be inferred onto their UOIL and Black Mountain claims as well. "Geologic inference" is a practice where, in certain contexts, information from one area is used to determine the reasonable likelihood of the persistence of similar mineralization in areas other than that actually tested or exposed. *See Dorothy Highsmith,* 137 IBLA 262, 263 (1996). The UOIL claimants' reliance on this practice to create a cognizable property right, however, is misplaced. While it is well-established that geologic inference may be used to ascertain the quantity and quality of a known mineral deposit, *see id.*, it alone can never be used to establish the mineral deposit's existence, *see Henault Mining Co. v. Tysk,* 419 F.2d 766, 770 (9th Cir. 1969); *Sandra K. Memmott,* 132 IBLA 283, 288 (1995).

Similarly, the UOIL claimants' arguments citing various BLM regulations and statutory limitations are improperly founded. In essence, the UOIL claimants contend that under BLM regulations, the Brook Report's alleged findings of "known mineral values" in the neighboring Meldrum claims rendered the exchange lands unavailable for conveyance to Del Webb. The UOIL claimants further allege that the land conveyance was unlawful because

---

1. This section states: "An action may be brought by any person against another who claims an estate or interest in real property, adverse to him, for the purpose of determining such adverse claim." Nev.Rev.Stat. § 30.010.

BLM made no "mineral in character" examination of the selected lands prior to "withdrawing" them. However, close examination of the cited regulations and statutes reveals the contrary. First, land exchanges like this one, conducted pursuant to subsection 209(a) of the FLPMA, are expressly excluded from the government's duty to reserve mineral rights in land patents. *See* 43 U.S.C. § 1719(a).[2] Similarly, the limitations on federal land conveyances set forth in 43 C.F.R. § 2720, upon which the UOIL claimants rely, are inapposite since they establish procedures for the conveyance of mineral interests owned by the United States through means *other* than land exchanges. *See* 43 C.F.R. § 2720.0-1.

Moreover, the Court is unconvinced by the UOIL claimants' argument that the BLM's alleged failure to conform with internal procedures, as expressed within BLM Instruction Memorandum 84–87, somehow create property rights in the exchange lands. As Del Webb points out, the provisions contained therein expired in 1987 and were no longer followed by BLM authorities during the conduct of the disputed land exchange. (*See* Ex. 3, Pl.'s Mot. For Summ.J.) Accordingly, the Court finds the UOIL mining claimants' reliance on these provisions to be misplaced.

In short, the UOIL claimants' failure to make an actual discovery of valuable minerals, within the bounds of their mining claims, is fatal to the assertion of any property rights in the exchange lands.[3] The practice of geologic inference, while applicable in other contexts under the statutory mining regime, cannot alone lead to the vesting of property rights.

**2.** This subsection states:
> All conveyances of title issued by the Secretary, *except those involving land exchanges provided for in section 1716* of this title, shall reserve to the United States all minerals in the lands, together with the right to prospect for, mine, and remove the minerals under applicable law and such regulations as the Secretary may prescribe, except that if the Secretary makes the findings specified in subsection (b) of this section,

**B. The Dadourian Claimants**

For slightly different reasons, the Court also finds that the Dadourian claimants have failed to demonstrate the acquisition of any property rights in the Black Mountain mining claims sufficient to cloud title to the exchange lands. The Dadourian claimants argue that they own the mining claims through the alleged acquisition of quitclaim deeds in their name. However, close examination of the chain of title and the Dadourian claimants own admissions indicate otherwise.

■ It is elementary that a quitclaim deed transfers only such title and interest as the grantor possessed when he delivered the title. *See, e.g. Van Rensselaer v. Kearney,* 52 U.S. (11 How.) 297, 322, 13 L.Ed. 703 (1850); *Hagan v. Gardner,* 283 F.2d 643, 646 (9th Cir.1960); *Dew v. Dower,* 269 Mont. 286, 888 P.2d 421, 423 (1994). To determine the interest conveyed by a quitclaim deed, a court must look to the deed's chain of title. *See* 23 Am.Jur.2d § 339 *Deeds* (1983). If no interest or title resides in the grantor, the grantee takes nothing. *See, e.g. Cox v. Gutman,* 575 S.W.2d 661, 664 (Tex.Civ.App.1978, writ ref'd n.r.e.); *Wilton Boat Club v. Hazell,* 502 S.W.2d 273, 276 (Mo.1973); *Columbia Realty Corp. v. Harrelson,* 155 Ind.App. 604, 293 N.E.2d 804, 811 (1973).

■ Here, the Dadourian claimants allege that they received their interest in the Black Mountain mining claims by quitclaim deeds from an entity known as U.S. Resources Management Trust (the "Trust"). (*See* Defs.' Resp., Doc. # 151, at 9) The Trust, in turn, allegedly acquired owner-

> the minerals may then be conveyed together with the surface to the prospective surface owner as provided in subsection (b) of this section.
> 43 U.S.C. § 1719(a) (emphasis added).

**3.** Due to the foregoing analysis, the Court finds it unnecessary to reach Del Webb's second argument involving the assertion of putative third-party rights.

ship of the mining claims through quitclaim deed from a distinct entity known as U.S. Resource Management. (*See* Ex. N, attached to Defs.' Resp.) The problem, Del Webb asserts, is that U.S. Resources Management never acquired any interest whatsoever in the mining claims to convey to the subsequent grantees (i.e., that there is a break in the chain of title).

 To this end, Del Webb submits deposition testimony indicating that the original locators of the Black Mountain mining claims never conveyed title to their claims to U.S. Resource Management. (*See* C. Brandon Prychodnik Dep., attached as Ex. 1 of Pl.'s Reply, Doc. # 158.) Del Webb also notes that in its state court pleadings, the Dadourian claimants themselves asserted that the "[mining claim] locators provided none of the right, title and interest in the mining claims to U.S. Resource Management by quitclaim deed or any other transference vehicle" and that as a result the "purported deed transfers [to the Dadourian claimants] were ineffectual." (*See* Ex. 3, ¶ 35, attached to Pl.'s Mot. for Summ.J.) Contrary to the Dadourian claimants assertions, "admissions in pleadings are generally binding on the parties and the Court." *American Title Ins. Co. v. Lacelaw, Corp.*, 861 F.2d 224, 226 (9th Cir.1988), *quoted with approval in In re Bakersfield Westar Ambulance, Inc.*, 123 F.3d 1243, 1248 (9th Cir.1997).

In opposition, the Dadourian claimants fail to submit any evidence challenging the alleged break in the chain of title to the Black Mountain claims. Instead, the Dadourian claimants vaguely assert that they "purchased interests in the UOIL mining claims." (See Defs.' Resp. at 4.) While such allegations are conceptually distinct from the matter of the Black Mountain claims, the Court notes that no evidence has been submitted in support.[4] Moreover, such an interest in the UOIL claims would in any case be null and void, given

the lack of an actual discovery of valuable minerals within the bounds of the mining claims. *See* analysis, *supra.* Accordingly, the Court finds that the Dadourian claimants have failed to raise any triable issues as to their alleged ownership rights to any mining claims within the exchange lands.

## C. Standing

 The Dadourian and UOIL claimants' failure to establish property rights to their mining claims will also deprives them of standing to countersue. Under Article III of the U.S. Constitution, a federal court may not hear a lawsuit unless the litigant demonstrates the required standing to sue. *Whitmore v. Arkansas*, 495 U.S. 149, 154, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). At an "irreducible constitutional minimum," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), a plaintiff must demonstrate (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of and (3) that the injury will likely be redressed by a favorable decision. *See Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). An "injury in fact" must be "an invasion of a legally protected interest" which is both "concrete and particularized" and "actual or imminent," as opposed to merely "conjectural" or "hypothetical." *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130 (citations omitted); *see also Presidio Golf Club v. National Park Serv.*, 155 F.3d 1153, 1157 (9th Cir.1998). Here, without any cognizable property rights to either the mining claims or, by connection, the exchange lands, the UOIL and Dadourian claimants simply have not suffered any injury in fact. Accordingly, the UOIL and Dadourian claimants have no standing to pursue the first cause of action alleged in the First Amended Complaint (Doc.

---

4. Defendants cite to evidence contained in "Exhibit D" of their pleadings. (*See* Pl.'s Resp. at 4.) Yet no such exhibit was ever attached to their pleadings or supplementary responses.

#120), which seeks the reconveyance of title to the mining claims.

IT IS THEREFORE ORDERED THAT Plaintiff and Counter–Defendant Del Webb's Motion for Summary Judgment (Doc. #128) quieting title to the exchange lands in its favor is GRANTED.

IT IS FURTHER ORDERED THAT Counter–Plaintiff and Defendant Berge Dadourian's, The Berge Dadourian Charitable Remainder Trust's Lucia Dadourian's, Lucia Dadourian Charitable Remainder Trust's, Martin Schaffer's, The Martin D. Schaffer Charitable Remainder Trust's, Sharon Schaffer's, The Sharon Schaffer Charitable Remainder Trust's, Foad Moazez's, Mojgan Moazez's, William R. Butler's and Debbie White's First Cause of Action for Injunctive Relief, contained in the First Amended Complaint (Doc. #120), is DISMISSED due to lack of standing.